UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

OLIVER E LEVITT, an individual

    Plaintiff,

v.                                                      Case No:  2:18-cv-36-FtM-99MRM

MARTI IOVINE, ANGELA J PRUITT,
GREGORY K. ADKINS and THE
SCHOOL DISTRICT OF LEE
COUNTY,

    Defendants.
_____/

## **OPINION AND ORDER**[1]

Before the Court is Defendants Marti Iovine, Angela Pruitt, Gregory Adkins, and the School District of Lee County's Motion to Dismiss (Doc. 28) and Plaintiff Oliver Levitt's Response in Opposition (Doc. 32).  This matter is ripe for review.

## **BACKGROUND**

This is a 42 U.S.C. § 1983 action coupled with two state law claims for breach of contract and defamation.  (Doc. 23).  Levitt claims the Defendants violated his First and Fifth Amendment rights while he was an instructor at a public high school, Success Academy.  (Doc. 23).  The School District operates Success Academy.  (Doc. 23 at ¶¶ 4-

---

[1] Disclaimer:  Documents filed in CM/ECF may contain hyperlinks to other documents or websites.  These hyperlinks are provided only for users' convenience.  Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees.  By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their websites.  Likewise, the Court has no agreements with any of these third parties or their websites.  The Court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

6). Pruitt is the School District's chief human resources officer and Adkins is its superintendent. (Doc. 23 at ¶¶ 4-6). Pruitt and Adkins responsibilities included the safe and efficient operation of Success Academy. (Doc. 23 at ¶ 12).

At all relevant times, Iovine was Success Academy's principal and was responsible for the administration of instruction and providing leadership for a school improvement plan. (Doc. 23 at ¶¶ 3, 11). Levitt was an instructor at Success Academy. (Doc. 23 at ¶ 2). Near the beginning of Levitt's tenure at Success Academy, he ran for and won the elected position of Lead Building Representative ("LBR"). (Doc. 23 at ¶ 4). The LBR, a position entitled to certain privileges under the Collective Bargaining Agreement ("CBA"), acts as a liaison between the faculty, school administration, and the Teacher's Association of Lee County ("TALC"). (Doc. 23 at ¶¶ 4, 14). Levitt's successful campaign put him at odds with Iovine, who preferred another candidate, Ball. (Doc. 23 at ¶¶ at 16-17). Since that result, Iovine sought to "get rid of" Levitt. (Doc. 23 at ¶¶ 17-18).

Shortly thereafter, Levitt emailed Iovine that multiple faculty and staff members advised him that Ball was behaving inappropriately, demeaning Levitt's character, and had engaged in a physical altercation with a student. (Doc. 23 at ¶ 19). Although Levitt requested Iovine act, she never did so. (Doc. 23 at ¶ 19). In the following months, Iovine issued or had her assistant principal issue Levitt two baseless letters of warning. (Doc. 23 at ¶¶ 21-22, 27). The letters contained false allegations about Levitt's failures as a teacher and his failure to adhere to the CBA. (Doc. 23 at ¶¶ 23, 27). Contrary to the School District's policy, Iovine never informed Levitt about the letters of warning: instead, Iovine placed the letters directly into Levitt's personnel file. (Doc. 23 at ¶¶ 21, 29).

Continuing this trend, Iovine evaluated Levitt's mid-year performance as unsatisfactory, but failed to follow state law requirements when she did not place Levitt on probation or evaluate him later. (Doc. 23 at ¶¶ 30-32). Levitt contends this action was punitive for his election as LBR and expressing concerns about school safety on behalf of Success Academy faculty and staff. (Doc. 23 at ¶ 32). During the same school year, Levitt, acting in his capacity as LBR, sent a series of emails to Iovine requesting a forum so Success Academy's faculty and staff could express their concerns and offer recommendations related to school safety. (Doc. 23 at ¶ 33). Iovine never responded to these emails. (Doc. 23 at ¶ 23). At TALC's recommendation, Levitt, again as LBR, used the School District's system to email Iovine, TALC representatives, district administrators, Pruitt, and Success Academy's faculty and staff requesting a forum on school safety. (Doc. 23 at ¶¶ 33, 52). Levitt also sent a hard copy of the email to Adkins. (Doc. 23 at ¶ 33). As a result, Iovine scheduled a meeting with Levitt, the assistant principal, and TALC representatives to discuss Levitt's use of the School District's internal system, a recent targeted evaluation, and Levitt's unsatisfactory performance. (Doc. 23 at ¶¶ 35-37). After the meeting, Iovine issued Levitt a formal letter of reprimand accusing Levitt of unethical behavior and threatening non-renewal of his teaching contract if the behavior continued. (Doc. 23 at ¶ 38). Levitt maintains the letter of reprimand was false, baseless, and defamatory. (Doc. 23 at ¶ 41).

Near the end of the school year, Iovine posted Levitt's final performance evaluation to Success Academy's internal system without first discussing it with Levitt as required by the CBA. (Doc. 23 at ¶ 41). For the first time in years, Levitt's performance evaluation rating fell below "effective." (Doc. 23 at ¶ 41). Iovine then recommended Levitt's contract

3

not be renewed.  (Doc. 23 at ¶ 41).  Pruitt and Adkins supported Iovine's contract non-renewal recommendation despite knowing of Iovine's personal vendetta against Levitt, and the School District ratified the recommendations by delegating final authority to Pruitt and Adkins.  (Doc. 23 at ¶¶ 40-41).

Levitt then grieved, or claimed issue with, his evaluation under the CBA and met with Iovine and Pruitt to discuss the final performance evaluation.  (Doc. 23 at ¶ 42).  Levitt alleges this was a Level I Formal Grievance under the CBA.  (Doc. 23 at ¶ 42).  Levitt objected to his evaluation score because it was unsupported by documentation required by the CBA, and it contradicted his prior evaluations and verbal praise he received from Iovine.  (Doc. 23 at ¶ 43).  As a result, Pruitt later provided TALC with Levitt's revised evaluation where his individual scores increased, but the total evaluation score still fell below effective.  (Doc. 23 at ¶ 45).  Because Levitt felt the revised ratings were still unsupported, TALC requested additional documentation on his behalf.  (Doc. 23 at ¶¶ 45-46).  Pruitt then provided TALC with supporting documentation containing additional false allegations.  (Doc. 23 at ¶¶ 46-49).

Because of the false allegations, TALC, on Levitt's behalf, filed a Level II Formal Grievance under the CBA.  (Doc. 23 at ¶ 50).  Pruitt rejected the grievance because Levitt filed no Level I Formal Grievance, it was untimely, and Levitt lacked standing.  (Doc. 23 at ¶ 50).  Levitt alleges that none of these were true.  (Doc. 23 at ¶ 50).  Levitt then asked TALC to seek arbitration of his grievance, but TALC denied the request.  (Doc. 23 at ¶ 63).

Levitt now seeks relief through this action.  Levitt's four-count Amended Complaint includes claims under § 1983 for violation of his First and Fifth Amendment rights against

4

all Defendants, a breach of contract claim against the School District, and a defamation claim against Iovine and the School District. (Doc. 23). In particular, Levitt alleges the Defendants violated his First Amendment right to free speech by retaliating against him for statements made in his capacity as LBR and as a citizen. (Doc. 23 at ¶¶ 51-54). He claims the Defendants deprived him of his Fifth Amendment rights to liberty and property without due process of law. (Doc. 23 at ¶¶ 56-59). Levitt also asserts that the School District breached the CBA. (Doc. 23 at ¶¶ 60-64). And finally, Levitt alleges that the School District and Iovine defamed him by making false written and oral statements about him. (Doc. 23 at ¶¶ 65-66). Defendants move to dismiss the Amended Complaint.

## STANDARD OF REVIEW

To survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, a complaint must contain sufficient factual allegations that raise a right to relief above the speculative level. *Bell A. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In reviewing a motion to dismiss, courts must accept all factual allegations as true and then determine whether the factual allegations plausibly give rise to a claim entitled to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While detailed factual allegations are not required, a complaint needs more than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Id.* And courts are under no obligation to accept legal conclusions as true. *Id.*

A complaint is also subject to dismissal under Rule 12(b)(6) if its allegations on their face show that an affirmative defense bars recovery on the claim. *See Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003). While a court is generally limited to reviewing the face of the complaint to determine the sufficiency of a plaintiff's claims, a

court may consider documents attached to a motion to dismiss if the attached documents are (1) central to plaintiff's claims and (2) the authenticity of the documents are not challenged. *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

## DISCUSSION

Here, Defendants present a host of arguments for dismissal. Iovine, Adkins, and Pruitt argue they are entitled to qualified immunity against Levitt's claims for breach of his First and Fifth Amendment rights. In a similar vein, Iovine contends that she is entitled to absolute immunity under Florida law against Levitt's defamation claim. The School District advances its own arguments: (1) Levitt failed to plead his § 1983 claims against it because he did not identify a policy or custom; (2) Levitt's claim for breach of contract fails because he did not exhaust his administrative remedies; and (3) Levitt failed to state a claim for defamation. For the following reasons, the Court will grant the Motion in part and deny it in part.

### A. Levitt's First Amendment Claim and Qualified Immunity

Levitt claims Defendants violated his First Amendment rights by retaliating against him for speech made in his capacity as LBR and as a citizen. (Doc. 23 at ¶¶ 51-54). Defendants argue that Iovine, Adkins, and Pruitt are entitled to qualified immunity against this claim. (Doc. 28 at 8-15). Levitt disputes this point. (Doc. 32 at 14-18).

Qualified immunity is a complete defense to a § 1983 claim. *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003). It applies if a government official performs a discretionary function in his individual capacity, unless his conduct violates clearly established statutory or constitutional rights of which a reasonable person would have

known. *Id*. Because qualified immunity is a complete bar to suit, it should be resolved "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

Courts have broken down the qualified immunity analysis into a multi-step process. To start, a government official must prove that he was acting within his discretionary authority. *Cottone*, 326 F.3d at 1357. If this burden is met, the plaintiff must then show the government official is not entitled to qualified immunity. *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012). A plaintiff can do so by showing that "(1) his complaint pleads a plausible claim that the defendant violated his federal rights (the 'merits' prong), and that (2) precedent in this Circuit at the time of the alleged violation "clearly established" those rights (the 'immunity' prong)." *Carollo v. Boria*, 833 F.3d 1322, 1328 (11th Cir. 2016). Courts are free to address the prongs in any order. *Id.*

Here, the parties contest every step. Iovine, Pruitt, and Adkins, individually, must establish that they acted within their discretionary authority. If so, Levitt must then establish a violation of a constitutional right that was clearly established.

1. *Principal Iovine's Discretionary Authority*

The parties take conflicting positions on whether Iovine acted within her discretionary authority. Iovine contends that she was acting within her discretionary authority because she took employment related actions. (Doc. 28 at 9-10). As best the Court can tell, Levitt does not substantively dispute that Iovine was acting for a job-related goal. Instead, Levitt argues that Iovine did not act in an authorized manner because her disciplinary actions were taken in bad faith and she failed to follow procedures before administering discipline. (Doc. 32 at 14-15).

7

The focus of the discretionary function analysis is whether the individual's actions are of a type that fell within the employee's job responsibilities. *See Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). The two-part analysis requires the court to determine whether a defendant's actions were "(1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority." *Harbert Intern., Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998). When applying these prongs, courts must "look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Holloman*, 370 F.3d at 1266.

To illustrate, in *Sims v. Metro. Dade County*, the plaintiff claimed the defendants suspended him from his state government position for exercising his First Amendment rights. 972 F.2d 1230, 1236 (11th Cir. 1992). In addressing the discretionary function issue, the court did not focus on whether it was within the defendants' authority to suspend a government employee for an improper reason, but whether defendants could administer discipline. *Id.* And in *Gaillard v. Commins*, a police officer was alleged to have violated the Fourth Amendment by using excessive force when pursing a fleeing felon. 562 Fed. App'x. 870, 873 (11th Cir. 2014). There, the court focused on whether a police officer may pursue a fleeing felon, not whether that police officer's specific conduct possibly violated department policy. *Id.*

Against that backdrop, the Court turns to Iovine's alleged actions. According to the Amended Complaint, Iovine retaliated against Levitt because of his election to LBR and comments he made while in that position. Iovine's retaliatory actions included writing

8

(or having the assistant principal write) two letters of warning, writing a letter of reprimand, evaluating Levitt as unsatisfactory during a mid-year evaluation, evaluating Levitt as below effective during the year-end evaluation, and recommending Levitt's contract not be renewed. (Doc. 23 at ¶¶ 52-53, 57). Framed in general terms, the analysis turns on whether a school principal may warn, reprimand, evaluate, or recommend the non-renewal of a teacher's contract. It does not focus on Iovine's intent or whether she violated procedures before undertaking the actions.[2] And it cannot reasonably be said that a school principal did not act for job-related goals or within the scope of her authority when performing these actions. *See Sherrod*, 667 F.3d at 1363.; *Bd. of Regents of State v. Snyder*, 826 So. 2d 382, 390 (Fla. 2d DCA 2002). Iovine met her burden.

  2. *Chief Human Resources Officer Pruitt's Discretionary Authority*

A similar analysis applies for Pruitt. Levitt alleges Pruitt supported Iovine's non-renewal recommendation, Pruitt participated in Levitt's year-end grievance process, and Pruitt barred Levitt from grieving both his letter of warning and his year-end evaluation. (Doc. 23 at ¶¶ 21, 40-42, 50, 52-53, 57). Again, the Court must frame these actions generally: whether a school district's chief human resources officer may participate in a teacher's grievance process, evaluate a teacher's grievance claims, or support the non-renewal of a teacher's contract. A chief human resources officer responsible for school "operation" clearly acted within her discretionary function by performing the alleged actions. Pruitt met her burden.

---

[2] Admittedly, if Levitt alleged that the CBA or state law completely prohibited Iovine from administering discipline, evaluating him, or recommending the non-renewal of his contract, this analysis would be different.

9

*3. Superintendent Adkins' Discretionary Authority*

Adkins advances two arguments associated with his discretionary authority. First, that he was acting within his discretionary authority. Second, that he is entitled to qualified immunity because Levitt does not allege he personally participated in any constitutional violation. (Doc. 28 at 11). Levitt does not contest the second issue. (Doc. 32).

To prove liability in a § 1983 suit, a plaintiff must plead that an individual defendant's personal actions violated his constitutional rights or that the individual defendant is liable as a superior. *Holloman*, 370 F.3d at 1263; *see also Gonzalez*, 325 F.3d at 1234. (describing how to establish supervisory liability under § 1983).[3] Personal liability requires that a plaintiff "show that the official, acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

The allegations against Adkins are sparse compared to the other individual Defendants. They are limited to Adkins' knowledge of Iovine's retaliatory actions obtained from email communications between Iovine and Levitt and from the letters of warning and reprimand, and that Adkins approved or joined in Iovine's actions by supporting the non-renewal of Levitt's contract. (Doc. 23 at ¶¶ 40, 52). These barebones allegations are insufficient to support personal liability. And it is unclear from the Amended Complaint if Levitt seeks to hold Adkins liable as a supervisor. The Court finds the more appropriate relief is to dismiss the claims against Adkins without prejudice and grant Levitt an opportunity to amend. *See Wooten v. Campbell*, 49 F.3d 696, 699 (11th Cir. 1995)

---

[3] Although *Gonzalez* discusses a *Bivens* action, the qualified immunity analysis is identical under either a *Bivens* or § 1983 action. *Wilson v. Layne*, 526 U.S. 603, 609 (1999).

(recognizing at the motion to dismiss stage, that the "Rule 12(b)(6) defense and the qualified immunity defense become intertwined" because both require that the court determine whether a plaintiff pled a violation of a constitutional right).

*4. First Amendment Claim*

Now, the Court must determine whether Levitt pled a First Amendment violation that was clearly established. See *Potter v. Williford*, 712 Fed. App'x. 953, 954 (11th Cir. 2017) ("[W]hether an official is entitled to qualified immunity is analyzed by looking to (1) whether the plaintiff established the violation of a constitutional right, and (2) whether that right was clearly established."). Here, the individual Defendants argue that Levitt's speech was not protected by the First Amendment because his speech was made in connection with his official duties. (Doc. 28 at 12-13). In contrast, Levitt contends that his speech was covered by the First Amendment because he was speaking in his role as LBR and as a citizen when he sent a series of emails to Iovine and others requesting a forum so Success Academy's faculty and staff could express their concerns and offer recommendations related to school safety. (Doc. 23 at ¶ 33).

To state a First Amendment retaliation claim, a plaintiff must plead (1) his speech was protected; (2) he suffered an adverse consequence; and (3) a causal relationship exists between the adverse conduct and protected speech. *Castle v. Appalachian Tech. College*, 631 F.3d 1194, 1197 (11th Cir. 2011). With a public employee, the Supreme Court has developed a two-part test to determine whether a public employee's speech is protected under the First Amendment. See *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).

> The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First

> Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

Id. at 418. (internal citations omitted).

The first inquiry, which is a practical one, "is whether the speech at issue 'owes its existence' to the employee's professional responsibilities." *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)). Courts may consider such non-dispositive factors as the employee's job description, where the speech occurred, and whether the speech concerns the subject matter of the employee's job. *Moss*, 782 F.3d at 618.

With that in mind, the Court turns to Levitt's emails that form the basis of his First Amendment claim. Levitt's first email was sent directly to Iovine shortly after his election to LBR and discussed Levitt's and other faculty member's safety concerns regarding the actions of Ball. (Doc. 23 at ¶ 19). Later in the school year, Levitt sent a series of emails to Iovine requesting that Iovine host a forum, so the faculty and staff could express their concerns and offer recommendation about school safety. (Doc. 23 at ¶ 33). After not receiving a response, Levitt emailed Iovine and carbon copied School District administrators, Pruitt, TALC representatives, and Success Academy's faculty and staff. This email also requested a safety forum and attached Levitt's prior emails to Iovine. (Doc. 23 at ¶ 33). Levitt alleges that he sent these emails as LBR and in his capacity as a citizen. (Doc. 23 at 52).

After reviewing the allegations in the Amended Complaint, the Court cannot determine whether Levitt sent the emails as a citizen or in his role as a Success Academy

12

instructor as it offers very little information about Levitt's instructor role. It is unclear if Levitt would ordinarily send these types of emails as an instructor, and Levitt's conclusory allegation that he was speaking in his capacity as a "citizen" is insufficient. *See Ashcroft, 556 U.S. at 679 (2009)* (noting that conclusions are not entitled to the presumption of truth). Nor does Levitt's allegation that he was speaking as LBR shed any additional light on the issue. The LBR position, while generally defined, is not so clearly separated from Levitt's instructor role in the Amended Complaint for a finding that Levitt acted outside the scope of his employment when he sent the emails. *See Hubbard v. Clayton County Sch. Dist.*, 756 F.3d 1264, 1267 (11th Cir. 2014) (finding that a school district employee, who was functionally on leave from the school district and acting as a union president, was entitled to First Amendment protection for speech made while union president). This is at least partially because Levitt's instructor role is never defined. Although separation may exist, the current allegations do not bear it out. At bottom, Levitt has not plausibly pled that he was speaking as a citizen and his First Amendment claim fails.

Accordingly, the Court will dismiss Levitt's First Amendment claim and allow him an opportunity to replead. *See Carollo,* 833 F.3d at 1332 (allowing plaintiff to amend some of his First Amendment claims because the court could not determine from the allegations whether plaintiff was speaking as a citizen). And since the Court is dismissing Levitt's First Amendment claim, it need not address the clearly established prong in this Order. Defendants are free to raise this defense again if Levitt chooses to file an amended pleading.

### B. Levitt's Fifth Amendment Claim

Even though the parties advance several arguments about Levitt's claim for violation of his Fifth Amendment rights, the claim fails for another reason. "The [F]ifth [A]mendment to the United States Constitution restrains the federal government, and the [F]ourteenth [A]mendment, section 1, restrains the states, from depriving any person of life, liberty, or property without due process of law." *Buxton v. City of Plant City, Fla.*, 871 F.2d 1037, 1041 (11th Cir. 1989); *see also Jordan v. Mosley*, 298 Fed. App'x. 803, 806 n.5 (11th Cir. 2008) ("[T]he Fifth Amendment applies only to Federal, not state, acts."). Levitt claims that state actors Iovine, Adkins, Pruitt, and the School District violated his Fifth Amendment rights to liberty and property without due process. Because Levitt cannot hold state actors liable under the Fifth Amendment, his Fifth Amendment claims are dismissed with prejudice.

### C. Failure to State § 1983 Claims Against the School District

The School District argues that the § 1983 claims against it must fail because Levitt did not allege that a School District policy or custom was the moving force behind the constitutional violations. (Doc. 28 at 15-17). Levitt, in a footnote, argues that the School District may be liable because final authority over Levitt's contract renewal was delegated to Pruitt and Adkins. (Doc. 32 at 22 n. 4). Here, the Court need not address the specifics of the parties' arguments because Levitt's First and Fifth Amendment claims are dismissed on other grounds.

### D. Breach of Contract Claim

Levitt claims the School District breached the CBA. (Doc. 23 at ¶¶ 60-64). The School District argues Levitt's breach of contract claim must fail because he failed to

14

timely request a hearing and failed to exhaust his administrative remedies under the CBA. (Doc. 28 at 17-18). In response, Levitt states he exhausted his administrative remedies under the CBA because he could not file an arbitration claim without TALC's approval, which was not given. (Doc. 32 at 18-19).

It is well settled that a party bound by a collective bargaining agreement must exhaust his administrative remedies before litigation. *Pub. Health Tr. v. Hernandez*, 751 So. 2d 124, 125 (Fla. 3d DCA 2000). The CBA lays the framework for a teacher to resolve his claim, defined as a grievance, for violation of the CBA.[4] (Doc. 28-1 at § 4.04). It calls for an informal and then formal grievance process that culminates in arbitration or voluntary mediation subject to certain requirements. Under § 4.04(2)(b) of the CBA, if Levitt was not satisfied with a Level II Formal Grievance or if no disposition was made during the time limits for that grievance procedure, he may submit the grievance to arbitration or voluntary mediation with approval from and representation by TALC.[5] Levitt

---

[4] As stated, a court may consider documents attached to a motion to dismiss if the attached documents are (1) central to plaintiff's claims and (2) the authenticity of the documents are not challenged. *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). Here, the Court finds the CBA meets both of these requirements.

[5] With regards to a Formal Level II Grievance, the CBA provides

> Level II: The Superintendent shall meet with the grievant and his/her legal counsel or Association representative if the grievant so chooses, within ten (10) working days of the date of filing, and attempt to resolve the grievance. The Superintendent shall indicate his/her disposition of the grievance in writing within seven (7) working days of such meeting and shall furnish a copy thereof to the grievant, the immediate supervisor, and to the Association. In the event the grievant is not satisfied with the disposition of the grievance at Step II, or if no disposition has been made within the time limits as provided in Step II, the grievant, with the approval from and representation by the Association, may submit the grievance to arbitration or voluntary mediation in accordance with the rules of the American Arbitration Association.

alleges that he timely pursued and exhausted his grievances under the CBA up to and including requesting a Level II Formal Grievance. (Doc. 23 at ¶¶ 50, 63). Levitt further alleges that Pruitt denied his Level II Formal Grievance request. (Doc. 23 at ¶ 50). Then Levitt sought arbitration under the CBA, but TALC denied that request. (Doc. 23 at ¶ 63). Because Levitt needed TALC's permission to pursue arbitration, Levitt exhausted his administrative remedies under the CBA. Thus, Defendants' Motion is denied on those grounds.

### E. Defamation Claim Against Iovine

Levitt alleges that Iovine defamed him by making false written and oral statements about Levitt's unethical behavior and failure to adequately instruct his students. (Doc. 23 at ¶¶ 65-67). Iovine argues she is entitled to absolute immunity under Florida law for any defamatory statements made as part of her duties. (Doc. 28 at 19-20). Levitt counters that Iovine was not acting within the scope of her duties when she made the defamatory statements because she was acting in bad faith and failed to assist Levitt in remediation of the alleged deficiencies. (Doc. 32 at 19-20).

Under Florida law, defamation has five elements: "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). Public employees enjoy absolute immunity from defamation suits if the statements were made as part of their duties. *Boggess v. Sch. Bd. of Sarasota County*, 8:06CV2245-T-27EAJ, 2008 WL 564641, at *5 (M.D. Fla.

---

(Doc. 28-1 at § 4.04).

16

Feb. 29, 2008). The scope of an official's duties is to be liberally construed. *See Prins v. Farley*, 208 So. 3d 1215, 1217 (Fla. 1st DCA 2017).

Levitt alleges that Iovine made false written and oral statements about him as the basis for declining to renew his contract. (Doc. 23 at ¶ 66). While it is not entirely clear which documents or statements Levitt refers to, he asserts that the letters of reprimand and warning and his mid-year and end-of-year evaluations are part of the public file. (Doc. 23 at ¶ 58). Therefore, the alleged false statements appear to come from these publications because they discuss Levitt's alleged unethical actions and his failure to adequately instruct his students. (Doc. 23 at ¶ 66).

Now that the Court has identified the alleged defamatory statements, it turns to the arguments. Levitt's argument that Iovine was not acting within her discretionary authority because she did not act in good faith and she failed to comply with procedures before disciplining Levitt falls flat. First, motive is generally not considered when determining if an official is acting within the scope of her authority. *See Lopez v. Sch. Bd. of Palm Beach County*, 98-8492-CIV-RYSKAMP, 1999 WL 1081263, at *15 (S.D. Fla. Oct. 27, 1999). Second, Iovine's failure to follow procedures requiring him to notify Levitt before disciplining or evaluating Levitt does not yank Iovine's actions outside the scope of her duties. The controlling factor is whether the speech was performed within the scope of an employee's duties, not whether the employee complied with the procedures before performing said duties. *See e.g. Hennagan v. Dept. of Hwy. Safety and Motor Vehicles*, 467 So. 2d 748, 750 (Fla. 1st DCA 1985) ("[C]onduct may be within the scope of employment, even if it is unauthorized, if it is of the same general nature as that of authorized or is incidental to the conduct authorized."). And it cannot reasonably be said

17

that a school principal may not issue a teacher official letters of reprimand or warning or evaluate a teacher's performance. Thus, these statements fall within the scope of Iovine's duties, and Iovine is entitled to absolute immunity for any defamation claim arising from these statements. But because it is not entirely clear if these statements encompass the entirety of Levitt's claim, the Court will allow him an opportunity to identify and sufficiently plead any other written or oral statements that form the basis of his defamation claim.

### F. Defamation Claim Against the School District

The School District argues that Levitt failed to state a claim for defamation against it because there are no allegations it published false statements about Levitt or that the School District is vicariously liable for Iovine's statements. (Doc. 28 at 18-19). Levitt did not respond to this argument. (Doc. 32). Indeed, it is unclear from the Amended Complaint how Levitt seeks to hold the School District liable, which simply provides that the School District unreasonably accepted Iovine's statements. (Doc. 23 at ¶ 66). Thus, the Court will dismiss this claim against the School District but allow Levitt a chance to amend.

Accordingly, it is now

**ORDERED:**

Defendants Marti Iovine, Angela Pruitt, Gregory Adkins, and The School District of Lee County's Motion to Dismiss (Doc. 28) is **GRANTED in part** and **DENIED in part.**

    a. Plaintiff Oliver E. Levitt's First Amendment claim is **DISMISSED without prejudice.**

    b. Plaintiff Oliver E. Levitt's Fifth Amendment claim is **DISMISSED with prejudice.**

c. Plaintiff Oliver E. Levitt's claim for defamation is **DISMISSED without prejudice.**

   d. All other claims survive.

2. Plaintiff Oliver E. Levitt may file a second amended complaint on or before **September 12, 2018**

3. Defendants must file a response to Plaintiff's pleading on or before **September 26, 2018**.

**DONE** and **ORDERED** in Fort Myers, Florida this 28th day of August 2018.

*[Signature]*
SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All Parties of Record