UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

OLIVER E LEVITT,

       Plaintiff,

v.                                 Case No:  2:18-cv-36-FtM-99MRM

MARTI IOVINE, ANGELA J PRUITT,
GREGORY K. ADKINS and THE
SCHOOL DISTRICT OF LEE
COUNTY,

       Defendants.
_____/

## OPINION AND ORDER[1]

     This matter comes before the Court on Defendants' Motion to Dismiss Third Amended Complaint (Doc. 45) filed on December 19, 2018.  Plaintiff filed a Response in Opposition (Doc. 48) on January 9, 2019.  For the reasons set forth below, the Motion is granted in part and denied in part.

## BACKGROUND

     This case centers on the termination of Plaintiff Oliver E. Levitt who brings a 42 U.S.C. § 1983 action coupled with two Florida state law claims for breach of contract and defamation.  (Doc. 42).  Levitt, a former teacher with the School District of Lee County (the "District") at Success Academy, claims Defendants violated his First and Fourteenth

---

[1] Disclaimer:  Documents filed in CM/ECF may contain hyperlinks to other documents or websites. These hyperlinks are provided only for users' convenience.  Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees.  By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their websites.  Likewise, the Court has no agreements with any of these third parties or their websites.  The Court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

Amendment rights under the U.S. Constitution when they fired him at the end of the 2016-17 school year in retaliation for his protected speech. Prior to his termination, Plaintiff had a yearly, renewable contract, and claims that he had a long track record of success with the District. At all relevant times, Dr. Marti Iovine was Success Academy's principal, Dr. Angela J. Pruitt was the School District's chief human resources officer, and Dr. Gregory T. Adkins was its superintendent. (*Id.*, ¶¶ 2-4).

Plaintiff is currently proceeding on a Third Amended Complaint.[2] (Doc. 42). Defendants move to dismiss the Third Amended Complaint because the individual Defendants are entitled to qualified immunity and/or absolute immunity, and because Plaintiff has failed to state a claim. The Court recounts the factual background that occurred throughout the 2016-17 school year leading up to Plaintiff's termination[3] as pled in Plaintiff's Third Amended Complaint, which the Court must take as true to decide whether the Third Amended Complaint states a plausible claim. *See Chandler v. Sec'y Fla. Dep't of Transp.*, 695 F.3d 1194, 1198-99 (11th Cir. 2012).

### A. Lead Building Representative Election

Teachers at schools in the District were and are represented by the Teacher's Association of Lee County (TALC). In the 2016-17 school year, the Collective Bargaining Agreement (CBA) entered into between TALC and the District (Doc. 42-1) provided that TALC would be represented at each school by a Lead Building Representative (LBR). (Doc. 42, ¶ 10). The CBA states that the LBR is an elected, continuing position, which

---

[2] The Court previously dismissed the initial Complaint with leave to amend and dismissed the Second Amended Complaint as a shotgun pleading. (Docs. 33, 39).

[3] The District disputes that Plaintiff was "terminated", instead asserting that his teaching contract was simply not renewed for the 2017-18 school year.

exempts the holder from an involuntary transfer if there is a surplus of teachers at the institution. (Doc. 42-1, ¶ 5.03(4)).

Even though the LBR was to be elected by members of TALC in the bargaining unit, in August 2016, Dr. Iovine informed the faculty that she had selected a particular instructor and personal friend, Mr. Ball, to be the LBR at Success Academy. (Doc. 42, ¶ 11). Because this action was contrary to the CBA, a group of faculty members, including Levitt, informed TALC's professional staff that Dr. Iovine had appointed Ball in violation of the CBA. (*Id.*) TALC intervened and told Dr. Iovine that the CBA required the faculty who were members of TALC to elect the LBR. (*Id.*) Dr. Iovine then allowed the faculty to elect the LBR, and Levitt won. (*Id.*) In his role as TALC representative, Levitt reported to and was supervised by the President of the union. (*Id.*, ¶ 21).

For the remainder of the school year, Dr. Iovine held a grudge against Levitt because he interfered with her appointment of Ball as LBR. (Doc. 42, ¶ 21.) Dr. Iovine imposed disciplinary actions on him, and meted our poor performance ratings, solely because he interfered with the appointment of Ball and because he became a TALC advocate for addressing concerns about violence at Success Academy.[4] (*Id.*) Throughout the school year, Dr. Iovine retaliated against Levitt because of his affiliation with TALC and advocacy for TALC. (*Id.*, ¶ 12).

**B. Defendants' Retaliatory Actions Against Levitt**

**1. Levitt's November 2, 2016 Email**

On November 2, 2016, Levitt sent Dr. Iovine an email (Doc. 42-2), writing that many TALC members whom he trusted and respected had advised him that Ball had

---

[4] Success Academy is "an alternative public high school for disruptive or violent students." (Doc. 42, ¶ 1).

been exhibiting strange and dangerous behavior, including rushing a student in the hallway while yelling "I am not your bitch bro, I will show you a bitch." (Doc. 42, ¶ 12). According to these TALC members, Ball had to be restrained by a school safety officer. (*Id.*) Levitt wrote that, for the safety of the school, he hoped Dr. Iovine would review the video of the incident, talk to the teachers and staff who were present, and act in the best interest of the school. (*Id.*) In writing the email, Levitt expressed the view of many TALC members that, because of Ball's abnormal behavior, he potentially presented a significant safety threat. (*Id.*) Under the CBA, "no employee was required to work in conditions that are not safe or secure . . ." (Doc. 42-1, CBA ¶ 6.01(3)). Therefore, as LBR, Levitt was obligated to bring this incident to Dr. Iovine's attention. (Doc. 42, ¶¶ 12, 14).

### 2. November 10, 2016 Meeting

Instead of working with Levitt to resolve the issue, at a meeting to discuss the email held on November 10, 2016, Dr. Iovine, without justification, advised Levitt that he had unfairly maligned Ball and violated school policy in doing so. (Doc. 42, ¶ 13). Dr. Iovine had not investigated the incident but used Levitt's email as an excuse to retaliate against Levitt for advocating for TALC. (*Id.*) Dr. Iovine also falsely told Levitt that she had spoken with students in his classes and they indicated he was not a good teacher. (*Id.*) Dr. Iovine fabricated these accounts because she held a grudge against Levitt for running for LBR and being an advocate for TALC. (*Id.*)

### 3. Letter of Concern #1

On November 14, 2016, Dr. Iovine issued a disciplinary letter (Letter of Concern #1) against Levitt (Doc. 42-3). Primarily, Dr. Iovine claimed that Levitt did not work cooperatively with other teachers and stated: "After review of your safety and negative

comments complaint [sic] of your colleague – Mr. Ball's, none were founded." (Doc. 42, ¶ 14). Dr. Iovine cited paragraph 5.01 of the "TALC Contract" that Levitt violated. (*Id.*) Contrary to the CBA, Dr. Iovine did not tell Levitt about Letter of Concern #1 and did not provide Levitt a copy. Instead, she secretly placed the letter in his personnel file, which prevented him from appealing it to Dr. Adkins. (*Id.*, ¶ 15).

### 4. Letter of Concern #2

On November 16, 2016,[5] a second disciplinary letter was issued (Letter of Concern #2) (Doc. 42-4). This letter primarily expressed concerns about Levitt's "restorative techniques" (*i.e.*, sending students to the principal's office too frequently instead of allowing them to stay in class). Dr. Iovine had never discussed this issue with Plaintiff before. (Doc. 42, ¶ 17). The letter failed to document any specific incidents in which Levitt used "restorative practices" inappropriately. (*Id.*, ¶ 18). The letter also claimed that Levitt was deficit in classroom technology, lacked ability to make instructional presentations, and failed to participate in outreach activities to community and business partners. (*Id.*) These issues, as well, had never been discussed with Levitt. (*Id.*)

### 5. School Safety Forum Request

As the 2016-17 school year progressed, Levitt received an increasing number of reports from fellow members of TALC about profane language and increasing incidents of physical violence at Success Academy. Members of the school's faculty, who were also members of TALC, requested that Levitt speak with Dr. Iovine and attempt to persuade her to host a forum at which faculty and staff could express their concerns about school safety. (Doc. 42, ¶ 20).

---

[5] The Third Amended Complaint states that this letter is dated November 10, 2016 (Doc. 42, ¶ 17). However, this appears to be a typo as the letter (Doc. 42-4) is dated November 16, 2016.

Responding to the faculty and staff's concerns, in January and February of 2017, Levitt wrote a series of emails to Dr. Iovine requesting that she host a forum at which faculty and staff could express their views about how to improve school safety (Doc. 42-5). The emails Levitt sent explicitly advised Dr. Iovine that he was requesting a forum as a representative of TALC because teachers and staff in the building, many of whom were TALC members, were becoming increasingly alarmed about working conditions at the facility. (Doc. 42, ¶ 22).

Dr. Iovine never responded to Levitt's emails and repeatedly refused to host a forum. (Doc. 42, ¶ 23). After continuing to receive complaints from members of the faculty and staff, and after conferring with TALC's professional staff, on February 16, 2017, at TALC's professional staff's direction, Levitt sent another email to Dr. Iovine, and copied various District administrators, including Dr. Pruitt (Doc. 42-5). TALC professional staff felt the situation was urgent and Levitt should send the email. (Doc. 42, ¶ 26). Levitt sent a hard copy of the email by internal mail to Dr. Adkins. (Doc. 42, ¶¶ 23, 48).

The February 16, 2017 email expressed concerns about safety issues at Success Academy and requested Dr. Iovine host a forum at which members of the faculty and staff could provide recommendations concerning safety at the school. (Doc. 42, ¶ 24). Levitt noted in the email that he had sent multiple prior requests on behalf of Success Academy faculty and staff and provided the email chain containing the prior requests. (*Id.*)

Shortly after the email was sent, Dr. Iovine scheduled a meeting to discuss the email, which was held on March 23, 2017. (Doc. 42, ¶ 25). At the meeting, attended by Dr. Iovine, Harris, and a TALC representative, Dr. Iovine contended that the email violated school policy because it was a public record and that she should have approved it before

Levitt sent it to District administrators. (*Id.*)  Dr. Iovine also contended that she would not have approved the email because the vast majority of the faculty did not believe there were significant issues at the school. (*Id.*)

### 6. Letter of Reprimand

On March 24, 2017, a day after the meeting, Dr. Iovine imposed a severe disciplinary action on Levitt, namely a Letter of Reprimand, which she provided to Drs. Adkins[6] and Pruitt for inclusion in Levitt's personnel file (Doc. 42-6).[7]  The letter falsely accused Levitt of violating the *Code of Ethics and the Principals of Professional Conduct of the Education Profession in Florida* because he sent the February 16, 2017 email to District administrators without Dr. Iovine's approval. (Doc. 42, ¶ 26).  Contrary to the Letter of Reprimand, the concerns he reflected were shared by the vast majority of faculty and staff. (*Id.*, ¶ 27).  Dr. Iovine imposed the Letter of Reprimand on Levitt because he exposed safety issues to District administrators including Drs. Adkins and Pruitt. (*Id.*, ¶ 28).  In effect, Dr. Iovine imposed a penalty on Plaintiff because, on behalf of TALC, he spoke publicly about safety conditions at the school. (*Id.*)

After receiving the Letter of Reprimand, Levitt filed a formal grievance (appeal) of the letter with Dr. Adkin's delegated representative, Dr. Pruitt.[8] (Doc. 42, ¶ 41).  In the course of the proceeding, Levitt learned for the first time that Dr. Iovine had placed Letters

---

[6] Pursuant to paragraph 4.04(2)(b) of the CBA, Dr. Adkins is ultimately responsible for the resolution of grievances. (Doc. 42, ¶ 46).  Although Dr. Adkins delegated the responsibility to address Levitt's grievance to Dr. Pruitt, he was informed of her actions on Levitt's grievances. (*Id.*)  When Levitt sought reconsideration of Dr. Pruitt's refusal to withdraw the Letter of Reprimand, he sent Dr. Adkins a copy of the letter. (Doc. 42-12).  Thus, Dr. Adkins was fully aware of the disciplinary actions against Levitt.

[7] Levitt did not sign the Letter of Reprimand.

[8] Dr. Adkins, however, received copies of Dr. Pruitt's reports on the grievances. (Doc. 42, ¶ 47).

of Concern # 1 and 2 in his school file.  (*Id.*)  Levitt attempted to join a grievance on these disciplinary letters with his grievance for the Letter of Reprimand, but Dr. Pruitt refused it, claiming it was untimely under the CBA.  (*Id.*; Doc. 42-10).  However, because Dr. Pruitt could see that Levitt had not signed Letters of Concern #1 and 2, she knew or should have known that he had no knowledge of them prior to the grievance.  (Doc. 42, ¶ 41). Therefore, Plaintiff alleges Dr. Pruitt violated his due process rights when she declined to allow the grievance on Letters of Concern # 1 and 2.

When Dr. Pruitt conducted a hearing on the Letter of Reprimand, she was aware that Dr. Iovine imposed the disciplinary action in retaliation for the February 16, 2017 email and knew Levitt was acting as LBR when he sent the email.  Yet, she did not recommend that the disciplinary action be rescinded, only that it be downgraded and called a "warning" instead of a "reprimand."  (Doc. 42, ¶ 42).  By filing to overturn the disciplinary action with knowledge that it infringed Levitt speech, Dr. Pruitt, as Dr. Iovine's supervisor, became complicit in Dr. Iovine's violations of Levitt's First Amendment rights. (*Id.*)

### 7.  Levitt's Mid-Year Evaluation

Shortly after Dr. Iovine's first disciplinary actions against Levitt, Letters of Concern #1 and 2, and without discussing the issue with Assistant Principal Harris, Dr. Iovine compiled a mid-year performance evaluation of Levitt.  (Doc. 42, ¶ 29).  Because Levitt was not a first-year teacher, this was outside standard practice.  (*Id.*)  *See* CBA, ¶ 8.02(1). The evaluation (Doc. 42-7) concluded that Levitt's first semester performance was "unsatisfactory" but provided no documentation.  (Doc. 42, ¶¶ 29-30).  Prior to this, Levitt had never received a performance evaluation of less than "effective" before.  (Doc. 42, ¶

29).  Dr. Iovine did not provide a copy of the mid-year evaluation to Levitt, never told him about it, and never gave him an opportunity to submit a rebuttal.  (*Id.*)  Dr. Iovine complied the mid-year evaluation to penalize Levitt for becoming LBR and expressing concerns about Ball's safety threats.  (*Id.*, ¶ 30).  The manner in which Dr. Iovine prepared and presented the evaluation violated the CBA because she prepared it secretly, did not provide a copy to Levitt, and did not allow him to submit a rebuttal.  (*Id.*)

### 8.  The Targeted Observation

The CBA required Dr. Iovine to engage in at least one formal observation of each classroom teacher per year.  It states that if deficiencies are noted, they must be recorded and that the principal "shall thereafter confer with the teacher and make recommendations as to the specific areas of unsatisfactory performance and provide assistance in helping to correct such deficiencies."  (Doc. 42-1, ¶ 8.02(4)).

On March 1, 2017, about two weeks after Levitt sent the February 16, 2017 email to District administrators, Dr. Iovine, accompanied by Assistant Principal Harris, conducted a formal observation of Levitt's class.  (Doc. 42, ¶ 32).  The formal observation was to evaluate Levitt's ability in Domain 3(B), Using Questioning and Discussion Techniques.  (*Id.*)  Dr. Iovine conducted her observation during the first 10 minutes of class even though she knew that during this time Levitt would have been engaged in administrative functions and was not involved in questioning and discussion with students.  (*Id.*)  Nevertheless, Dr. Iovine rated Levitt "unsatisfactory."  (*Id.*)  During a meeting with TALC on March 23, 2017, Dr. Iovine agreed the rating was invalid and agreed to redo the formal observation.  (*Id.*)

On April 1, 2017, Dr. Iovine and Harris conduct the repeat formal observation. (Doc. 42, ¶ 33). This time, Levitt was engaged in Domain 3(B) discussion when they observed the class, which was about diversifying a financial portfolio and Levitt was instructing the students to use diversification to decrease financial risk, a topic involving higher order thinking (HOT). (*Id.*) After observing the class, Dr. Iovine indicated to Harris that Levitt's facility with HOT was excellent. (*Id.*) However, in her written evaluation (Doc. 42-8), Dr. Iovine reversed course and rated the performance "needs improvement." In violation of the CBA, Dr. Iovine failed to "make recommendations as to specific areas of unsatisfactory performance and provide assistance in helping to correct such deficiencies." (Doc. 42-1, ¶ 8.02(4)).

On May 26, 2017, at a meeting with TALC at which Dr. Pruitt was present on the final day of school, Dr. Iovine could not explain what she found objectionable about Levitt's performance during the formal observation. (Doc. 42, ¶¶ 33, 43). Dr. Iovine provided an unfavorable evaluation as a penalty for Levitt's February 16, 2017 email to District administrators. (*Id.*)

### 9. Levitt's End-of-Year Performance Evaluation

Near the end of the school year, Dr. Iovine posted Levitt's final performance evaluation to Success Academy's internal system without first discussing it with Levitt as required by the CBA. (Doc. 42-1, ¶ 8.02(5)). She also did not give him the opportunity to submit a rebuttal, as required by the CBA and state law. (Doc. 42, ¶¶ 35, 37).

Levitt appealed the ratings and thereafter Dr. Iovine provided what she claimed was documentation (Doc. 42-9) - a "total fabrication" according to Levitt. (Doc. 42, ¶ 36). Although Dr. Iovine claimed several deficient areas of performance, she could not explain

any respect in which Levitt's performance was less than "effective." (*Id.*)  Instead, Dr. Iovine rated Levitt less than effective as a penalty for serving as LBR and expressing the faculty and staff's concerns about school safety.  (*Id.*)

Levitt met with Drs. Iovine and Pruitt on May 26, 2017 to discuss the Final Performance Evaluation.  (Doc. 42, ¶ 43).  At the meeting, Dr. Pruitt admitted that the ratings did not comply with the CBA.  (*Id.*)  Dr. Pruitt agreed to work with Dr. Iovine over the summer to review the ratings.  (*Id.*)

On July 27, 2017, Dr. Pruitt provided Levitt with a copy of the revised ratings she and Dr. Iovine prepared.  (Doc. 42-7).  However, the revised ratings did not provide any documentation for the original ratings or the revisions.  (Doc. 42, ¶ 44).  Thus, Levitt asked for a hearing on the ratings, which Dr. Pruitt rejected.  (*Id.*; Doc. 42-11).  In addition, in violation of the CBA, Dr. Pruitt falsely claimed that Levitt had failed to address the ratings in a formal meeting with Dr. Iovine before seeking a hearing.  (*Id.*)  She also falsely claimed Levitt lacked standing because his contract had expired on June 30, 2017, even though the reason he filed for the hearing was that he was seeking to have his contract renewed.[9]  (*Id.*)  Plaintiff believes Dr. Pruitt violated Levitt's right to due process of law by denying the hearing.  (*Id.*)

### C.  Dr. Iovine's Comments About Levitt to Other Administrators

Following Levitt's February 26, 2017 email to District administrators, Dr. Iovine telephoned Assistant Principal Harris late that night on his cell phone and told him to

---

[9] The exact date and manner in which Plaintiff was informed that his contract would not be renewed for the 2017-18 school year is not clear from the Third Amended Complaint. Drs. Pruitt and Adkins supported Dr. Iovine's contract non-renewal recommendation despite knowing of Dr. Iovine's personal vendetta against Levitt, and the District ratified the recommendations by delegating final authority to Drs. Pruitt and Adkins.  (Doc. 42, ¶¶ 52-53).

disband the bowling team he played on with Levitt and not socialize again. (Doc. 42, ¶ 38). Further, Dr. Iovine told Colin Kleinmann, Lee County's Counselor of the Year, that Levitt's classes were smaller than those of the average teacher and that she intended to "get rid of" Levitt at the end of the school year. (*Id.*, ¶ 39). These comments were untrue and were made in a school hallway and the comments were outside either parties' professional responsibilities. (*Id.*) Dr. Iovine made these defamatory statements because she held a grudge against Levitt for serving as LBR and expressing TALC's concerns about school safety in the February 16, 2017 email.[10]

Levitt now seeks relief through this action. Levitt's four-count Third Amended Complaint includes claims under § 1983 for violation of his First and Fourteenth Amendment rights against all Defendants, a breach of contract claim against the School District, and a defamation claim against Iovine and the School District. In particular, Levitt alleges that Defendants violated his First Amendment right to free speech by retaliating against him for statements made in his capacity as a citizen (Count I). He claims Defendants deprived him of his Fourteenth Amendment rights to liberty and property without due process of law (Count II). Levitt also asserts that the District breached the CBA (Count III). And finally, Levitt alleges that the District and Dr. Iovine defamed him by making false statements about him (Count IV).

---

[10] Plaintiff alleges that Dr. Adkins was aware of the safety issues at Success Academy and the primary reason Dr. Adkins supported Drs. Pruitt and Iovine's disciplinary actions against Levitt was that he wanted to suppress Levitt's speech concerning school safety. (Doc. 42, ¶¶ 48-51). Dr. Adkins supported their recommendation that Levitt's contract not be renewed for the same reason. (*Id.*, ¶ 51).

## LEGAL STANDARD

To survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, a complaint must contain sufficient factual allegations that raise a right to relief above the speculative level. *Bell A. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In reviewing a motion to dismiss, courts must accept all factual allegations as true and then determine whether the factual allegations plausibly give rise to a claim entitled to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While detailed factual allegations are not required, a complaint needs more than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Id.* And courts are under no obligation to accept legal conclusions as true. *Id.*

A complaint is also subject to dismissal under Rule 12(b)(6) if its allegations on their face show that an affirmative defense bars recovery on the claim. *See Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003). While a court is generally limited to reviewing the face of the complaint to determine the sufficiency of a plaintiff's claims, a court may consider documents attached to a motion to dismiss if the attached documents are (1) central to plaintiff's claims and (2) the authenticity of the documents are not challenged. *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

## DISCUSSION

### A. Qualified Immunity Analysis (Counts I, II)

Defendants assert qualified immunity as to Counts I (First Amendment) and II (Fourteenth Amendment). To receive qualified immunity, a government official "must first prove that he was acting within the scope of his discretionary authority when the allegedly

wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). Plaintiff does not dispute this first step.

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.* at 1194. To do so, the plaintiff must make a two-part showing. First, the plaintiff must allege that the facts of the case, if proven to be true, would make out a plausible constitutional violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Beshers v. Harrison*, 495 F.3d 1260, 1265 (11th Cir. 2007). Second, the plaintiff must allege that the constitutional right was "clearly established" at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232. Because qualified immunity provides a complete defense from suit, "courts should ascertain the validity of a qualified immunity defense as early in the lawsuit as possible." *Gilmore v. Hodges*, 738 F.3d 266, 272 (11th Cir. 2013). Regarding Plaintiff's two-part showing, Defendants dispute whether the Third Amended Complaint plausibly alleges both prongs with respect to both Counts I and II.

### 1. First Amendment Free Speech Claim (Count I)

#### a. Constitutional Violation

The constitutional right at issue in Count I is the First Amendment's right of free speech. To state a First Amendment retaliation claim, a plaintiff must plead (1) his speech was protected; (2) he suffered an adverse consequence; and (3) a causal relationship exists between the adverse conduct and protected speech. *Castle v. Appalachian Tech. College*, 631 F.3d 1194, 1197 (11th Cir. 2011). Defendants mainly take issue with the first prong.

Time and time again, the Supreme Court has reiterated that "[s]peech by citizens on public concerns lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Lane v. Franks*, 573 U.S. 228, 235-35 (2014) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)). And "[t]his remains true when speech concerns information related to or learned through public employment." *Id.* For it is well established that the acceptance of public employment does not require the employee to relinquish their constitutional rights, especially those afforded under the First Amendment. *Id.*

But a public employee's right to share information is not absolute. Instead, the Supreme Court has "acknowledged the government's countervailing interest in controlling the operation of its workplaces" because "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Lane, 573 U.S. at 235-35.* Consequently, "[t]he problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 568 (1968).

The First Amendment "protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). It is well established that "[a] government employer may not demote or discharge a public employee in retaliation for speech protected by the First

Amendment." *Alves v. Bd. of Regents of the Univ. Sys. of Georgia*, 804 F.3d 1149, 1159 (11th Cir. 2015).  To establish a claim under the First Amendment, a plaintiff must plead and ultimately prove that: (1) he was speaking; (a) as a citizen; (b) on a matter of public concern; (2) his interests in speaking outweighed the interests of the government as an employer under the Pickering framework ; and (3) the speech played a substantial or motivating role in the adverse employment action.  *Lane*, 573 U.S. at 235-42; *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1159-60 (11th Cir. 2015); *Vila v. Padron*, 484 F.3d 1334, 1339 (11th Cir. 2007).

Thus, as a public employee, for his speech to be afforded constitutional protection, Plaintiff must first plausibly allege that he spoke as a citizen on a matter of public concern. Defendants dispute whether Levitt spoke as a citizen on a matter of public concern when he made the reports identified in the Third Amended Complaint.

### (1) Speech as Employee or Citizen

The District asserts that Levitt's speech was made as an employee of the District, not as a private citizen, and therefore is not protected by the First Amendment.  Levitt responds that his speech arose from his role as LBR, not teacher.  The Court finds that Plaintiff has plausibly alleged that he spoke as a citizen.

Determining whether an employee spoke as a citizen turns on whether the speech "owes its existence to a public employee's professional responsibilities."  *Garcetti*, 547 U.S. a 421-22.  The phrase "must be read narrowly to encompass speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of her employment, not merely speech that concerns the ordinary responsibilities of her employment."  *Alves*, 804 F.3d at 1162.  "The critical question … is whether the speech

at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* Factors such as "the employee's job description, whether the speech occurred at the workplace, and whether the speech concerned the subject matter of the employee's job" may all be considered. *Id.* at 1161. However, these factors are not dispositive. *Id.*

Here, Levitt's speech included, but was not limited to, allegations of:

- The November 2, 2016 email to Dr. Iovine regarding Ball's erratic behavior and school safety concerns

- Emails sent to Dr. Iovine regarding school safety concerns

- School safety forum request, including the February 16, 2017 email to District administrators

- Statements about security issues at a March 24, 2017 grievance hearing

From the allegations, it is plausible that the complaints were not within the job duties of teachers like Plaintiff. The Court reaches this conclusion mainly because Plaintiff made the complaints at the request of faculty, staff, and TALC members. For example, Plaintiff alleges that he sent Dr. Iovine an email on November 2, 2016 because many TALC members who he trusted and respected had advised him that Ball had been exhibiting strange and dangerous behavior. (Doc. 42, ¶ 12). Regarding the school safety forum request, Plaintiff alleges that members of the school's faculty, who were also members of TALC, requested that Levitt speak with Dr. Iovine and attempt to persuade her to host a forum at which faculty and staff could express their concerns about school safety. (Doc. 42, ¶ 20). And Plaintiff states that when he wrote the series of emails to Dr. Iovine requesting a forum in January and February of 2017, he was responding to the faculty and staff's concerns. (*Id.*, ¶ 22). The emails Levitt sent explicitly advised Dr. Iovine that

he was requesting a forum as a representative of TALC because teachers and staff in the building, many of whom were TALC members, were becoming increasingly alarmed about working conditions at the facility. (Doc. 42, ¶ 22). Then after continuing to receive complaints from members of the faculty and staff, and after conferring with TALC's professional staff, on February 16, 2017, at TALC's professional staff's direction, Levitt sent another email to Dr. Iovine, and copied various District administrators, including Dr. Pruitt (Doc. 42-5).

If Plaintiff was not LBR, and merely a teacher at Success Academy, it is unlikely that faculty, staff, and TALC members would be requesting that he send their concerns to Dr. Iovine, and it is equally unlikely that Levitt's speech-related activities in this case are required in his role as teacher.[11] And Defendants' argument that Levitt's role as a teacher involves ensuring student safety does not carry the day. Undoubtedly every teacher should ensure their student's safety, but Levitt's speech here is mainly voicing the concerns of others in his capacity as LBR, representing the interests of TALC pursuant to the CBA. Just because Levitt should ensure the safety of his students does not convert his First-Amendment protected complaints as a union representative to employee speech.

It is plausible that the types of complaints Plaintiff made were not within the job duties of a teacher and he did not speak about these issues in the manner that he did because his job required him to speak about it. *See Garcetti*, 547 U.S. at 421. Thus,

---

[11] At this point, little is known about the LBR position. Although the CBA is attached to the Third Amended Complaint (Doc. 42-1), it does not set forth in any detail the role of the LBR. However, at the motion to dismiss stage, the Court accepts the allegations regarding the LBR role as true.

because Plaintiff has plausibly alleged that his speech arose from his role as LBR and not as a teacher, the first prong is satisfied.

### (2) Matter of Public Concern

The District argues that Levitt's speech, even if made as a citizen and not as an employee, did not address a matter of public concern, and therefore is not protected by the First Amendment. "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public. The inquiry turns on the content, form, and context of the speech." *Lane*, 573 U.S. at 241. *See Boyce v. Andrew*, 510 F.3d 1333, 1343 (11th Cir. 2007) (internal citations omitted). If the "main thrust" of a public employee's speech is on a matter of public concern, the speech is protected. *Alves*, 804 F.3d at 1162. Whether the speech is communicated to the public is relevant, but not dispositive. *Id.*

Plaintiff alleges that the serious safety risks occurring at Success Academy were reported by local television news, resulting in email exchanges between members of the public and District administrators, and that the safety in public schools is a public concern. (Doc. 42, ¶¶ 49, 57). Based on the allegations as plausibly alleged in the Third Amended Complaint which the Court accepts as true, Levitt's speech concerning the safety of Success Academy, the safety and well-being of students, teachers, and administrators of a public school is a matter of public concern as identified by the Eleventh Circuit. *See Boyce*, 510 F.3d at 1344; *Alves*, 804 F.3d at 1166 (finding that an employee whose speech directly affects the public's perception of the quality of education in a given academic system is protected). And that the impetus for his speech was a concern for

public safety which he was tasked with protecting in his role as LBR. *See King v. Bd. of Cnty. Comms.*, --- F.3d ---, 2019 WL 994031, *7 (11th Cir. Mar. 1, 2019); *Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1319 (11th Cir. 2005) (finding that in various contexts the court has made "clear that speech relating to the safety of the public involves a matter of public concern").

### b. Clearly Established Right

Next, Plaintiff must allege that the constitutional right was "clearly established" at the time of the alleged misconduct. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "So conceived, the object of the 'clearly established' immunity standard is not different from that of 'fair warning.'" *United States v. Lanier*, 520 U.S. 259, 270 (1997). Applicable here, the Eleventh Circuit has held that the relevant inquiry is whether "binding opinions from the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the highest court in the state where the action is filed ... gave [the defendant] fair warning that his treatment of [the plaintiff] was unconstitutional." *Merricks v. Adkisson*, 785 F.3d 553, 559 (11th Cir. 2015).

Defendants argue that there is no "bright line" factual situation in which controlling law clearly applies because there is no clearly established precedent on whether Plaintiff's speech made in his capacity as LBR is speech made as a citizen or as an employee.

In *Carollo v. Boria*, the Eleventh Circuit found that "reasonable public officials would have known at the time of Carollo's termination that it violated the First Amendment to terminate a colleague for speaking about matters of public concern that are outside the scope of his ordinary job responsibilities." 833 F.3d 1322, 1334 (11th Cir. 2016). The court found that Carollo at least "plausibly pled that at least some of his speech was about matters of public concern and outside the scope of his ordinary job responsibilities." *Id.* at 1334-35. *See also Cook,* 414 F.3d at 1318 ("The law is clearly established that a public employer may not retaliate against an employee for an employee's exercise of constitutionally protected speech.") In line with Eleventh Circuit precedent that was in effect at the time of the alleged constitutional violations in this case, the Court finds that Plaintiff has plausibly alleged that his First Amendment Rights were clearly established.

Thus, because Plaintiff has plausibly alleged a constitutional violation occurred, and that the constitutional right was clearly established, the Motion to Dismiss Count I is denied.

### 2. Fourteenth Amendment Procedural Due Process Claim (Count II)

#### a. Constitutional Violation

Plaintiff alleges that Defendants are liable under the Fourteenth Amendment for violating his property and liberty interests by declining to reappoint him to his contract in retaliation for exercising his First Amendment rights. It is axiomatic that "[t]he requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972). The Court will consider each interest in turn.

### (1) Property Interest

Plaintiff asserts that he had a property interest in his teaching contract which was deprived because, had he not been subject to Dr. Iovine's retaliatory actions, renewal of the contract was mandatory, citing ¶ 5.01(a) of the CBA which states: "An annual contract teacher who has received an effective or highly effective rating on their last three (3) consecutive annual evaluations shall be reappointed, if a teaching position exists at the school where the teacher is employed at the time of reappointment." Before Dr. Iovine's retaliatory actions, Plaintiff had never received a composite performance rating of less than effective.

Defendants argue that a review of the CBA reveals that Plaintiff was not entitled to appointment and would not have been entitled to reappointment even if his evaluation had been effective. Defendants state that the contract expired at the end of the year and Plaintiff worked through and received all the benefits of his 2016-17 contract and was not automatically entitled to a contract for the 2017-18 school year.

The Supreme Court has recognized that a government employee may have a constitutionally protected property interest in continued government employment. *Roth, 408 U.S. at 577*. In order to establish that he had a property interest in his position, Plaintiff must show that he had a "legitimate claim of entitlement" to his continued employment. *Id.*; *Sullivan v. Sch. Bd. of Pinellas Cnty., 773 F.2d 1182, 1185 (11th Cir. 1985)*. For example, a permanent government employee whose employment may be terminated only for cause has a property interest in his continued employment. *Blanton v. Griel Memorial Psychiatric Hosp., 758 F.2d 1540, 1542 (11th Cir. 1985)*; *Thompson v. Bass, 616 F.2d 1259, 1265 (5th Cir. 1980)*, *cert. denied*, *449 U.S. 983 (1980)*. An

employee's mere subjective expectation of continued employment does not give her a constitutionally protected property interest. *Perry v. Sinderman*, 408 U.S. 593, 603 (1972); *Roth*, 408 U.S. at 577. However, a "person's interest in a benefit is a 'property interest for due process purposes if there are ...' rules or mutually explicit understandings that support [her] claim of entitlement to the benefit." *Perry,* 408 U.S. at 601.

Here, the Court cannot (and need not) determine whether Plaintiff was actually deprived of a constitutionally-protected property interest as the record is not yet developed in this regard, including whether Defendants' actions followed the procedures of the CBA or any other policies and procedures normally followed by the District when they declined to renew Plaintiff's contract. The Court is likewise unaware at this point of any "mutual explicit understanding" existed. Given the lack of any factual record at this point, the Court only looks to the allegations in the Third Amended Complaint, wherein the Court finds that Plaintiff plausibly alleges that Defendants imposed disciplinary actions on him, including termination, without following the procedures of the CBA in retaliation for his protected speech.

### (2) Liberty Interest (Stigma-Plus Test)

Plaintiff alleges that Defendants deprived him of his liberty interest to move easily to other employment opportunities by failing to renew his contract in violation of the CBA and imposing unfounded disciplinary actions and below par mid-year and end-of-year evaluations, which became part of the public file. (Doc. 42, ¶¶ 70-71). Plaintiff states that the stigma attached to these disciplinary actions impaired his professional opportunities in Lee County and any other school district in the state. (*Id.*, ¶ 71). Defendants argue

that Plaintiff has offered little more than speculation that Defendants damaged his prospects for future career opportunities.

Conduct causing damage to an employee's reputation in connection with a termination of employment may give rise to an actionable procedural due process claim for deprivation of liberty, sometimes referred to as a "stigma-plus" suit, which Plaintiff argues he satisfies in this case. *See Cotton v. Jackson*, 216 F.3d 1328, 1330 (11th Cir. 2000); *see also Sammons v. Cameron*, Case No. 2:04-cv-161-FTM29DNF, 2005 WL 1027509, *4 (M.D. Fla. Apr. 15, 2005). To establish such a procedural due process claim, Plaintiff must prove that: "(1) a false statement (2) of a stigmatizing nature (3) attending a governmental employee's discharge (4) was made public (5) by the governmental employer (6) without a meaningful opportunity for an employee name clearing hearing." *Cotton*, 216 F.3d at 1330.

The Eleventh Circuit has summarized what is required to satisfy the stigma-plus test. "To establish a liberty interest sufficient to implicate the fourteenth amendment safeguards, the individual must not only be stigmatized but also stigmatized in connection with a denial of a right or status previously recognized under state law." *Smith v. Siegelman*, 322 F.3d 1290, 1296 (11th Cir. 2003); *see also Cypress Ins. Co. v. Clark*, 144 F.3d 1435, 1436-37 (11th Cir. 1998) ("This rule, labeled the "stigma-plus" standard, requires a plaintiff to show that the government official's conduct deprived the plaintiff of a previously recognized property or liberty interest in addition to damaging the plaintiff's reputation.")

The Court finds that Plaintiff has plausibly pled the requirements to satisfy the stigma-plus test, which the Court must accept as true at the Motion to Dismiss stage.

Namely, that Dr. Iovine included false statements about Levitt's competence and character in the Letters of Concern and Reprimand, claiming that he fails to interact collegially with other members of the faculty and that he violated ethical standards. Plaintiff alleges that the conduct stigmatized him because it labelled him as unprofessional and of low moral character and the false statements were included in his personnel file, which Plaintiff alleges is public (Doc. 42, ¶ 71). Plaintiff also incorporates by reference into Count II (*Id.*, ¶ 64) the false statements that Dr. Iovine made to Colin Kleinmann. Moreover, Levitt was never given a meaningful opportunity for a name-clearing hearing because Drs. Pruitt and Adkins improperly rejected his grievances and allowed the Letters of Concern and Letter of Reprimand to stand.

### b. Clearly Established

Defendants argue that the clear terms of Plaintiff's annual contract show that he had no vested right or expectation to continued employment under the CBA or Florida law. Thus, Defendants did not violate a "clearly established" right under the Fourteenth Amendment. However, as discussed above, the parties dispute whether Plaintiff's contract was terminated in compliance with the terms of the CBA and accepting the well-pled allegations in the Third Amended Complaint, the Court has found that Plaintiff has plausibly alleged that Defendants imposed disciplinary actions on him, including termination, without following the procedures of the CBA in retaliation for his protected speech.

### 3. Defendant Adkins Liability - Personal Participation

Defendant Adkins argues that qualified immunity is appropriate as to him because there are no allegations to suggest that he personally participated in any of the activity of

which Plaintiff complains.  (Doc. 45, p. 19).  While the Court agrees that Plaintiff must allege facts sufficient to show that each named Defendant personally participated in the alleged constitutional violation, *see Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003), Plaintiff has done so in this case, alleging that Dr. Adkins had knowledge of Drs. Iovine and Pruitt's retaliatory actions but did nothing to prevent them.  *See* Doc. 42, ¶¶ 46-52; *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (a supervisor might be subjected to individual liability when the supervisor personally participates in the alleged constitutional violation or where there is a causal connection between the supervising official and the alleged constitutional deprivation).

Specifically, Plaintiff alleges that because Dr. Adkins was ultimately responsible for the resolution of grievances, Dr. Adkins was informed of the Letter of Reprimand and of Levitt's reports on his grievances.  (Doc. 42, ¶¶ 46-47).  Dr. Adkins was also aware of the safety concerns Levitt raised in his emails to Dr. Iovine (*Id.*, ¶¶ 48-50).  A primary reason that Dr. Adkins supported Drs. Pruitt and Iovine's disciplinary actions against Levitt was that he wanted to suppress Levitt's speech concerning school safety and he supported their recommendation that Levitt's contract not be renewed for the same reason.  (*Id.*, ¶ 51).

## B.  District Liability Under Section 1983

Defendant next argues that it cannot be liable to Plaintiff solely because of *respondeat superior* for injuries caused by District employees, citing *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 691 (1978).  Rather, the District can only be liable under Section 1983 if the execution of the District's "official policy" or "custom" serves as the "moving force" of a constitutional violation.  Plaintiff responds that *Monell* does not

insulate a municipal authority from liability for unconstitutional acts of its employees when it delegates all responsibilities in a particular area to those employees and in this case the District delegated complete authority to discipline Levitt and renew, or not renew, his contract to Drs. Adkins, Pruitt, and Iovine.  In addition, it was the District's policy to screen employees' speech on matters of public concern.

Title 42 U.S.C. § 1983 imposes liability on anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws [.]"  To state a claim under 42 U.S.C. § 1983, a plaintiff must allege: (1) the defendant deprived him of a right secured under the United States Constitution or federal law, and (2) such deprivation occurred under color of state law.  *Salvato v. Miley*, 790 F.3d 1286, 1295 (11th Cir. 2015).

A municipal governing body may be held liable for acts or policies of individuals to whom it delegated final decision-making authority in a particular area.  *Matthews v. Columbia Cty.*, 294 F.3d 1294, 1297 (11th Cir. 2002) ("Local government liability can exist when someone with final policymaking authority delegates that authority to someone else. But the delegation must be such that the decision is not subject to review by the policymaking authority.").  In *Holloman ex rel. Holloman v. Harland*, the Eleventh Circuit noted a theme that "reiterated through much of our case law – in assessing whether a governmental decision maker is a final policy maker, we look to whether there is an actual 'opportunity' for 'meaningful' review."  370 F.3d 1252, 1293 (11th Cir. 2004).

Plaintiff does not address the meaningful review issue in his brief; instead, Plaintiff simply argues that because he has alleged that the District delegated complete authority to discipline Levitt to Drs. Adkins, Pruitt, and Iovine he has stated a Section 1983 claim

against the District.  Although it is unknown at this point whether the decisions made by Drs. Adkins, Pruitt, and Iovine were subject to review by the District, that is an issue that will be determined after the pleading stage.  At this point, Plaintiff has plausibly alleged that all responsibility over disciplinary actions and appointment decisions were delegated by the District to Defendants.  (Doc. 42, ¶ 72).  This is enough at the pleading stage.

### C.  Breach of Contract (Count III)

In Count III, Plaintiff alleges breach of the CBA against the District only, claiming that the District breached the CBA and state law by refusing to renew Plaintiff's contract. The District argues that the claim fails because Plaintiff has not shown that he would have been entitled to renewal.  However, as discussed above, the parties dispute whether Defendants followed the CBA when refusing to renew his contract.  Plaintiff has plausibly alleged that a breach occurred as the Third Amended Complaint alleges other breaches of the CBA apart from the contract non-renewal.  *See* Doc. 42, ¶¶ 10-11, 15-18, 29, 33-36.

### D.  Defamation (Count IV)

Under Count IV, Plaintiff brings a defamation claim against Dr. Iovine and the District. Levitt alleges that Dr. Iovine defamed him by making false written statements as set forth in the Letter of Reprimand and the Letters of Concern.  (Doc. 42, ¶ 81).  Levitt further alleges that Dr. Iovine made false oral statements defaming Levitt when he called Assistant Principal Harris on his cellphone after hours to vilify him.  (*Id.*, ¶ 82).  Plaintiff alleges that Dr. Iovine also told Colin Kleinmann, a school guidance counselor, in a school hallway after a meeting that Levitt was not pulling his weight and that she was going to

get rid of him. (*Id.*, ¶ 83). Plaintiff states that these comments resulted in damage because they maligned his character and professional competence. (*Id.*)

Dr. Iovine argues she is entitled to absolute immunity under Florida law for any defamatory statements made as part of her duties. Levitt counters that Dr. Iovine was not acting within the scope of her duties when she made the defamatory statements because she was acting in bad faith and failed to assist Levitt in remediation of the alleged deficiencies.

Under Florida law, defamation has five elements: "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). Additionally, defamatory language includes that which "tend[s] to injure a person in [his] office, occupation, business, or employment and which in natural and proximate consequence will necessarily cause injury," or that which "imputes to another conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession or office." *Scobie v. Taylor*, No. 13-60457-Civ, 2013 WL 3776270, *2 (S.D. Fla. July 17, 2013) (quoting *Metropolis Co. v. Crosadell*, 199 So. 568, 569 (Fla. 1941)) (alterations in original).

Public employees enjoy absolute immunity from defamation suits if the statements were made as part of their duties. *Boggess v. Sch. Bd. of Sarasota County*, 8:06CV2245-T-27EAJ, 2008 WL 564641, at *5 (M.D. Fla. Feb. 29, 2008). The scope of an official's duties is to be liberally construed. *See Prins v. Farley*, 208 So. 3d 1215, 1217 (Fla. 1st DCA 2017). The controlling factor is whether the speech was performed within the scope

of an employee's duties, not whether the employee complied with the procedures before performing said duties. *See e.g. Hennagan v. Dept. of Hwy. Safety and Motor Vehicles, 467 So. 2d 748, 750 (Fla. 1st DCA 1985)* ("[C]onduct may be within the scope of employment, even if it is unauthorized, if it is of the same general nature as that of authorized or is incidental to the conduct authorized.").

### 1. Dr. Iovine

The Third Amended Complaint describes three discrete instances of alleged defamation against Dr. Iovine: (1) the Letters of Reprimand and Concern; (2) the afterhours cell phone call to Assistant Principal Harris; and (3) the comments to Colin Kleinmann. (Doc. 42, ¶¶ 82-83). As the Court stated in its previous Opinion and Order (Doc. 33), it cannot reasonably be said that a school principal may not issue a teacher official letters of reprimand or warning or evaluate a teacher's performance. Thus, the statements in the Letters of Reprimand and Concern fall within the scope of Dr. Iovine's duties, and Dr. Iovine is entitled to absolute immunity for any defamation claim arising from them. However, it is plausible that the cell phone call to Harris and the comments to Kleinmann were not performed within the scope of Dr. Iovine's regular duties and were "off the record." Thus, absolute immunity as to these two instances is denied.

### 2. The District

The District argues that Levitt failed to state a claim for defamation against it because there are no allegations it published defamatory statements about Levitt or that the District is vicariously liable for Dr. Iovine's statements. Plaintiff responds that as Dr. Iovine's employer, the District is responsible for her defamatory words.

An employer's liability for an employee's intentional acts may arise when the acts are within the 'real or apparent scope' of employment." *Trabulsy v. Publix Super Mkt., Inc.*, 138 So. 3d 553, 555 (Fla. 5th DCA 2014) (quoting *Weiss v. Jacobson*, 62 So. 2d 904, 906 (Fla. 1953)).

> Conduct is within the scope of employment if it occurs substantially within authorized time and space limits, and it is activated at least in part by a purpose to serve the master. The purpose of the employee's act, rather than the method of performance thereof, is said to be the important consideration. Stated another way, only when the employee steps aside from his employment to ... accomplish some purpose of his own, is the act not within the scope of employment. This is generally a question of fact for the jury.

*Id.* at 555 (internal citations and punctuation omitted). An employee's conduct is within the scope of his employment, where: (1) the conduct is of the kind she was employed to perform, (2) the conduct occurs substantially within the time and space limits authorized or required by the work to be performed, and (3) the conduct is activated at least in part by a purpose to serve the master. *Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.*, 783 So. 2d 353, 356 (Fla. 3d DCA 2001) (holding pastor's criminal conduct was independent, self-serving act and did not occur within course and scope of employment).

Here, Plaintiff has failed to state a plausible claim against the District for vicarious liability for the cell phone call that Dr. Iovine made to Assistant Principal Harris and for the comments Dr. Iovine made to Kleinmann. The cell phone call was made after hours, outside the workplace, and was not the kind of conduct she was employed to perform. Furthermore, Plaintiff himself alleges that the comments made to Kleinmann were "made privately [ ] outside of her role as a principal at Success Academy." (Doc. 42, ¶ 83).

Accordingly, it is now

**ORDERED:**

Defendants' Motion to Dismiss Third Amended Complaint (Doc. 45) is **GRANTED**

**IN PART AND DENIED IN PART**.

1. Dr. Iovine's Motion to Dismiss certain statements from Count IV is granted.

2. Count IV against the District is dismissed with prejudice in its entirety.

3. The Motion to Dismiss is denied in all other respects.

**DONE** and **ORDERED** in Fort Myers, Florida this 7th day of March, 2019.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All Parties of Record