UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

Oliver E. Levitt,                               Case No. 2:18-cv-36-FtM-PAM-MRM

    Plaintiff,

v.                                              **MEMORANDUM AND ORDER**

Marti Iovine, Angela J Pruitt,
Gregory K. Adkins, and The
School District of Lee County,

    Defendants.

---

This matter is before the Court on the parties' cross-Motions for Summary Judgment. For the following reasons, Plaintiff's Motion for Partial Summary Judgment is denied and Defendants' Motion for Summary Judgment is granted.

**BACKGROUND**

In the fall of 2016, Plaintiff Oliver Levitt was a newly hired teacher at Success Academy, an alternative school for troubled students in Lee County. Before Success Academy, Levitt taught for five years at Success Academy's predecessor, Alternative Learning Center. (3d Am. Compl. (Docket No. 42) ¶ 9.)[1]

At the time, the principal of Success Academy was Defendant Marti Iovine. Iovine was also relatively new to the school, having been appointed principal in April 2016. (Id. ¶ 8.) At the beginning of the 2016-2017 school year, Iovine told the staff that she had

---

[1] The Court relies on the pleadings for basic facts because the parties' briefs do not clearly set forth the background in this matter.

chosen teacher John Ball to act at the lead building representative ("LBR") for the teacher's union, the Teacher's Association of Lee County ("TALC"). (Id. ¶ 11.) According to Levitt, Ball was a "personal friend" of Iovine (id.); according to Iovine, she had worked with Ball previously but they were not friends outside of the school setting (Pl.'s Ex. 8 (Docket No. 67-8) (Iovine Dep.) at 34-36).

Levitt and other teachers complained to the union about this appointment. (3d Am. Compl. ¶ 11.) The union contacted Iovine and told her that the collective bargaining agreement required that teachers elect the LBR, not that the principal appoint the LBR. (Id.) The union thereafter held an election and Levitt was elected to the LBR position. (Id.) Levitt believes that, "[f]or the remainder of the school year, Dr. Iovine held a grudge against Mr. Levitt because he interfered with her appointment of Mr. Ball as LBR." (Id.)

Levitt also alleges that Iovine retaliated against him when he advocated on behalf of the union. (Id. ¶ 12.) Levitt sent Iovine several e-mails regarding what he characterizes as safety issues at the school, and ultimately included Lee County School District administrators, including Defendant Angela Pruitt, who is the District's Chief Human Resources Officer, on his emails to Iovine. (Id.; see also id. ¶ 3.)

In March 2017, shortly after Levitt's email that included District administrators, Iovine wrote a "Letter of Reprimand" for Levitt's personnel file. (Id. ¶ 26; id. Ex. 6.) The Letter of Reprimand asserted that Levitt violated his ethical responsibilities under Florida law by copying District administrators on the email. (Id. Ex. 6 at 1-2.) This letter was provided to Pruitt and to Defendant Gregory Adkins, the Superintendent of the District. (Id. ¶ 26.) Levitt alleges that Iovine wrote the Letter of Reprimand "because [Levitt]

exposed safety issues to District administrators." (Id. ¶ 28.) Levitt filed a grievance regarding the Letter of Reprimand, and Pruitt held a hearing on the grievance. She concluded that the Letter should be "downgraded" to a warning that would be in Levitt's school file but not in his District personnel file. (Id. ¶ 42.)

In Levitt's final performance evaluation for the school year, Iovine rated him "developing/needs improvement" in most categories, and "unsatisfactory" in one category. (Pl.'s Ex. 17 (Docket No. 67-18).) His contract to teach at Success Academy was not renewed.

Levitt's Third Amended Complaint asserts four claims. Count I alleges that all Defendants retaliated against Levitt for his exercise of First Amendment rights, in violation of 42 U.S.C. § 1983. Specifically, Levitt contends that he engaged in six instances of protected speech: (1) his discussions with the union regarding Iovine's appointment of Ball to be LBR; (2) telling school administrators that he wanted to be on the ballot for the LBR position; (3) a November 2016 email to Iovine regarding an incident involving Ball and a student; (4) January and February 2017 emails to Iovine regarding school safety; (5) the February 2017 email about security issues that was copied to District administrators; and (6) Levitt's statements about those security issues at the Letter of Reprimand grievance hearing. (3d Am. Compl. ¶ 56.) Levitt alleges that all of these instances address matters of public concern, "namely the safety of Success Academy, a public middle and high school." (Id. ¶ 57.) He contends that Defendants retaliated against him by imposing discipline, such as the Letter of Reprimand, and giving him poor performance ratings. (Id. ¶ 58.)

3

Count II raises a due-process claim under § 1983, contending that Levitt had a property interest in continued employment at Success Academy and that all Defendants failed to provide him with the process he was due before depriving him of that property right. (Id. ¶ 66.) He also asserts that Defendants deprived him of "his liberty interest to move easily to other employment opportunities by failing to renew his contract," disciplining him, and giving him bad performance reviews. (Id. ¶ 70.)

Count III contends that the District breached its collective bargaining agreement ("CBA") with the union by not reinstating him. (Id. ¶ 79.) Finally, Count IV asserts that Iovine defamed him and that the District is vicariously liable for her defamation. (Id. ¶¶ 81-83.) Levitt seeks injunctive relief in the form of requiring Defendants to remove any negative material from his personnel file and to revise his final performance ratings, and to require Defendants to allow Levitt to continue teaching in the District "as long as he performs satisfactorily." (Id. p. 28.) He also seeks unspecified compensatory and punitive damages, and attorney's fees. (Id. p. 29.)

**DISCUSSION**

Summary judgment is proper only if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999) (citation omitted).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001). When opposing a motion for summary judgment, the nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials and "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citation omitted).

Levitt first contends that the Court cannot revisit its prior rulings with respect to the validity of his First Amendment claims. (Pl.'s Opp'n Mem. (Docket No. 74) at 3 n.2.) But a ruling on a motion to dismiss that a claim is plausibly pled is not binding on a motion for summary judgment, where the Court must consider the evidence in support of that claim. The Court's previous rulings do not mandate denial of Defendants' Motion on Levitt's First Amendment claim.

Defendants argue that they are entitled to qualified immunity on Levitt's claims under § 1983. To overcome a defense of qualified immunity, it is Levitt's burden to show that the undisputed facts make out a violation of his constitutional rights, and also that the rights were "clearly established" at the time of the violation. Pearson v. Callahan, 555

U.S. 223, 239 (2009).² Because Levitt has failed to establish that the facts demonstrate that Defendants violated his constitutional rights, his § 1983 claims fail on that basis alone.

**A. First Amendment**

"A government employer may not demote or discharge a public employee in retaliation for speech protected by the First Amendment." Alves v. Bd. of Regents of the Univ. Sys. of Georgia, 804 F.3d 1149, 1159 (11th Cir. 2015). To determine whether a public employee's speech is constitutionally protected, the Court must first "determin[e] whether the employee spoke as a citizen on a matter of public concern." Garcetti v. Ceballos, 547 U.S. 410, 418 (2006). "If the answer is no, the employee has no First Amendment cause of action based on his . . . employer's reaction to the speech." Id. If the employee was speaking as a citizen on a matter of public concern, the Court must then determine whether the employer "had an adequate justification for treating the employee differently from any other member of the general public." Id. These questions are a matter of law for the Court to determine. Alves, 804 F.3d at 1159.

"The threshold question is comprised of two components. For a government employee's speech to be constitutionally protected, the employee must speak (1) as a private citizen and (2) on a matter of public concern." Santarlas v. City of Coleman, No. 5:16cv380, 2018 WL 3495863, at *2 (M.D. Fla. July 20, 2018). Thus, the Court must

---

² Levitt similarly argues that the Court's previous determination that he plausibly pled that the rights involved were clearly established precludes Defendants from arguing to the contrary. But again, the Court's decision on a motion to dismiss is not binding at summary judgment in the way Levitt argues. Summary judgment tests the facts in the record, not the allegations in the pleadings.

6

examine "both the 'role the speaker occupied' and 'the content of the speech' to ascertain whether the putative government retaliation at issue necessitates the Pickering test, which balances rights of the speaker against the practical considerations of government operations." Id. (quoting Alves, 804 F.3d at 1160; citing Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, 391 U.S. 563, 568 (1968)).

In his briefs on these Motions, Levitt discusses many instances of allegedly protected speech that are not mentioned in his Third Amended Complaint. He may not amend his pleadings in arguments on a Motion for Summary Judgment, and the Court will not consider any speech other than the six instances pled in the Third Amended Complaint.

### 1. Private Citizen

The parties seem to agree that any speech Levitt made in his capacity as LBR is speech as a citizen. (Defs.' Supp. Mem. (Docket No. 68) at 10.) But even assuming that a union rep is ipso facto not speaking in his role as an employee, at least three of Levitt's statements were not made in his capacity as LBR: the first two statements, which were made before Levitt became LBR, and his statements at the grievance hearing, which were made regarding his role as a teacher and had nothing to do with his status as LBR. Levitt does not address this, merely contending that all of his statements were made in his capacity as LBR and therefore were made as a citizen. But "[i]f the speech 'owes its existence to a public employee's professional responsibilities,' that indicates the speech is not protected by the First Amendment." King v. Bd. of Cty. Comm'rs, 916 F.3d 1339, 1346 (11th Cir. 2019) (quoting Garcetti, 547 U.S. at 421). Levitt's complaints regarding the LBR appointment and his request to the union that he be allowed to run for LBR undoubtedly

7

owe their existence to Levitt's job, and that his comments at his own employee grievance hearing stem from his job responsibilities is beyond cavil. See, e.g., Alves, 804 F.3d at 1165 (noting that an employee speaks pursuant to his professional responsibilities "when reporting conduct that interfered with [his] ordinary job duties"). Levitt's First Amendment claim as to these three statements must be dismissed.

2. **Public Interest**

Assuming that the other three statements, all of which were made in emails, were made in his capacity as LBR and are therefore at least arguably citizen speech, the Court must next determine whether the content of the speech involved a matter of public concern. Courts have repeatedly found that "speech that concerns internal administration of the educational system and personal grievances will not receive constitutional protection." Maples v. Martin, 858 F.2d 1546, 1552 (11th Cir. 1988); see also Mpoy v. Rhee, 758 F.3d 285, 291 (D.C. Cir. 2014) (finding a teacher's email to school district administrators that "list[ed] a litany of complaints indicating that the school, and particularly its principal, had been interfering with [the teacher's] 'primary duty'" to be unprotected speech).

"'[T]he relevant inquiry is not whether the public would be interested in the topic of the speech at issue,' it is 'whether the purpose of [the employee's] speech was to raise issues of public concern.'" Alves, 804 F.3d at 1167 (quoting Maggio v. Sipple, 211 F.3d 1346, 1353 (11th Cir. 2000) (emphases in Alves) (internal quotation marks omitted)). Moreover, contrary to what appears to be Levitt's implicit assumption, speech in his capacity as LBR is not automatically speech on a matter of public concern.

8

Levitt repeatedly characterizes his speech as not only addressing school safety, but also addressing Success Academy's "culture." But even if speech regarding school culture is always speech on a matter of public concern,[3] the actual content of the speech belies this characterization. Moreover, this alleged focus on school culture is found nowhere in Levitt's pleadings.

    a.    <u>November 2016 email</u>

Levitt's November 2016 email to Iovine concerned an incident involving Mr. Ball, the teacher whom Iovine initially appointed to be LBR. The email mentions that another teacher talked to Iovine "about negative things he heard Mr. Ball saying about myself to other students" and adds that Levitt "heard that [Mr. Ball] said similar things about another teacher to his students." (Pl.'s Supp. Mem. Ex. 10 (Docket No. 67-11).) Levitt then goes on to recount what he had been told about a hallway incident between Mr. Ball and a student, in which Mr. Ball ostensibly threatened to fight with the student. The email closes by asking Iovine to look at the video of the incident and talk to those who were present, "[f]or the safety of our school, and more importantly our students." (Id.)

School safety is undeniably a matter of public concern. However, the mere fact that this email addressed school safety is not dispositive. Rather, the Court must

---

[3] Defendants note that Levitt's sudden focus on school "culture" likely stems from the fact that none of the District administrators testified that they were concerned about safety at Success Academy, making it unlikely that any speech regarding safety could have caused the retaliation about which Levitt complains. (See, e.g., Pl.'s Supp. Mem. Ex. 26 (Docket No. 67-26) (Adkins Dep.) at 55 (testifying that he was not aware of safety concerns at Success Academy).) Superintendent Adkins testified that he was concerned about Success Academy's "culture," and Levitt appears to be attempting to bootstrap the facts to fit this expressed concern, in order to bolster his retaliation claim. (Id. at 56-58.)

9

determine whether the purpose of this email was to raise issues of public concern. Alves, 804 F.3d at 1167. The email's subject is "issue regarding student safety," lending credence to Levitt's argument that the purpose of the email was a matter of public concern. And the content of the email, while also mentioning that Mr. Ball had bad-mouthed teachers to their students, is primarily concerned with the incident in the hall. Moreover, the email emphasizes concerns for safety, fear amongst staff members, and the potential for injuries. The November 2, 2016, email addressed a matter of public concern and is thus protected speech under the First Amendment.

      b.     <u>January and February 2017 emails</u>

Levitt's January 27, 2017, email asks Iovine to meet with teachers "as a whole in a forum setting so everyone can be heard." (Pl.'s Supp. Mem. Ex. 19 (Docket No. 67-20).) The email states that "[i]t is our belief that this will aid in team building." (<u>Id.</u>) Similarly, Levitt's February 13, 2017, email notes that he has "requested a meeting with you and [TALC] members for quite some time." (<u>Id.</u> Ex. 21 (Docket No. 67-22).) Levitt states that "we have some excellent solutions to many of the issues at our school and would like to be heard in a forum setting by you, our principal." (<u>Id.</u>)

These emails do not raise any matter of public concern. Even if the "issues" Levitt mentions in his February email include school safety, it is clear that these emails are addressed to what he and other teachers perceive as poor management on the part of Iovine. <u>See</u> <u>Linhart v. Glatfelter</u>, 771 F.2d 1004, 1010 (7th Cir. 1985) (noting that courts are required "to look at the point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public

10

concern? Or was the point to further some purely private interest?"). Levitt is not attempting to bring any wrongdoing to light but is merely complaining that Iovine will not hold a forum meeting with members of the union. His First Amendment claim as to this speech must be dismissed.

      c.      <u>February 16, 2017, email</u>

On February 16, 2017, Levitt again emailed Iovine to ask her to hold a forum meeting with members of the union. (Pl.'s Supp. Mem. Ex. 22 (Docket No. 67-23).) He copied several District administrators on this email and included the email chain in which he repeatedly asked Iovine for a forum meeting with union members. The email mentions safety, noting that "[j]ust today four kids were arrested on campus . . . for fighting." (<u>Id.</u> at 1.) The email then goes on to discuss "[a]nother issue:" overcrowding. Levitt states that "Success was designed to hold no more than 150 students" but now has "over 200 students enrolled with four or five less teachers than last year." He states that "we realize the growing numbers are not your fault" but nevertheless "we would like some answers and guidance." (<u>Id.</u>) Finally, he notes that the assistant principal, Mr. Harris, met with teachers the previous day and was asked why Dr. Iovine never meets with the teachers. Levitt closed by again requesting a meeting with the group "so we can offer solutions." (<u>Id.</u>)

The public certainly might be interested in Levitt's February 16 email. But the question is not public interest, but rather "whether the purpose [of the email] was to raise issues of public concern." <u>Maggio</u>, 211 F.3d at 1353 (quotation omitted). Even taking the evidence in the light most favorable to Levitt, the only conclusion can be that the

purpose of this email was purely personal to Levitt and the other teachers at Success Academy. The email is a list of complaints "indicating that the school, and particularly its principal, had been interfering with" the teachers' jobs by not sufficiently supporting the teachers or by not sufficiently listening to the teachers. Mpoy, 758 F.3d at 291. "At bottom, the impetus for [his] speech was frustration at work, not fear for public safety or the public purse." King, 916 F.3d at 1349. Levitt's First Amendment claim as to this email must be dismissed.

### 3. **Pickering balancing test**

The determination that Levitt's November 2, 2016, email is speech entitled to constitutional protection does not end the analysis. The Court must next examine whether the District "had an adequate justification for treating [Levitt] differently from any other member of the general public" based on his speech. Garcetti, 547 U.S. at 418. But this presumes that indeed the District did treat Levitt differently; in other words, before determining whether there was an adequate justification for any different treatment, the Court must first examine whether there was different treatment in the first instance, and whether Levitt's speech caused any such different treatment.

The parties do not specifically argue about any retaliation with respect to each instance of Levitt's speech. Rather, they argue about whether the Letter of Reprimand in March 2017 was retaliation for Levitt's February 16 email. And Defendants focus on the qualified-immunity question: was there a case clearly establishing that Defendants could not do what they did, namely issuing the Letter of Reprimand and ultimately not renewing Levitt's contract.

12

But Levitt's February 16 email was not speech on a matter of public concern and thus cannot support a First Amendment claim. The only question remaining is whether there was any different treatment after Levitt's November 2, 2016, email. The only record evidence of different treatment is the two "letters of concern" that Iovine placed in Levitt's school file. The first of these is dated November 14, 2016. (Pl.'s Supp. Mem. Ex. 12.) This letter recounts a November 10 meeting between Iovine, Levitt, and Assistant Principal Harris, which discussed Levitt's November 2 email and other issues. The letter does not go into any detail about Levitt's expressed safety concerns, instead focusing on Levitt's complaints regarding Mr. Ball bad-mouthing him and other teachers, which Iovine said she investigated and were "unfounded." (Id. at 1.) And the letter outlines Iovine's belief that Levitt was spending too much time during the school day at another school on the same campus, where his wife was assistant principal. (Id. at 1-2.)

The second Letter of Concern is dated November 16, 2016. (Pl.'s Supp. Mem. Ex. 14.) This letter, signed by Assistant Principal Harris rather than Iovine, discussed Levitt's ostensible failure to use restorative practices rather than sending students out of his class for misbehavior. It also encouraged Levitt to use technology in his classroom, and to support the school's goals of working with community partners. Levitt asserts that Harris testified that he did not believe that Levitt deserved to be disciplined and that Iovine directed him to write the November 16 letter. (Harris Dep. (Pl.'s Supp. Mem. Ex. 2) at 53, 59.) But this mischaracterizes Harris's testimony. Harris testified that he did not believe that either Letter of Concern was disciplinary. (Id. at 52; see also id. at 55 ("I did not view [the Nov. 14] letter as disciplinary.").) And he said that Iovine asked him to

13

write the second letter because it would be a good learning opportunity for him as a first-year assistant principal. (Id. at 59-60.)

Given the timing of these letters and Levitt's email, the Court cannot say as a matter of law that they do not constitute differential treatment on the basis of his speech. The question then becomes whether Iovine "had an adequate justification for treating [Levitt] differently from any other member of the general public" based on his November 2 email. Garcetti, 547 U.S. at 418. In other words, the question is whether Defendants "had an adequate justification for [the Letters of Concern] other than [Levitt's] speech." Carollo v. Boria, 833 F.3d 1322, 1329 (11th Cir. 2016).

The letters themselves proffer Defendants' justifications for them. Levitt contends that these justifications were pretext, but he offers no evidence to support that contention. Indeed, he often misstates the record and relies almost solely on hearsay in an attempt to prove his claims. This is insufficient when opposing Defendants' properly supported summary-judgment Motion. Defendants have offered an adequate justification for the two Letters of Concern. "A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." Garcetti, 547 U.S. at 418. Taking the facts in the record in the light most favorable to Levitt, the Letters of Concern were directed at speech that affected the school's operation. Levitt has not established a First Amendment claim as to the November 2, 2016, email.

**B.      Due Process**

Levitt's due-process claim has two parts:  one is a procedural due-process claim, contending that Defendants deprived Levitt of his property interest in continued employment without giving him due process.  (3d Am. Compl. ¶ 66.)  The second part argues that Defendants deprived him of a liberty interest in besmirching his employment record.  (Id. ¶ 70.)

Even if Levitt had a property interest in continued employment, as he contends, he received all the process that was due.  He had a grievance hearing, and while Pruitt did not allow him to grieve the two Letters of Concern because any grievance with regard to those was untimely, this determination is not a violation of Levitt's due-process rights.  The CBA provides the due-process framework here, and under the CBA Levitt had the opportunity to be heard.  (See id. Ex. 1 Art. 4.)  That he did not avail himself of that opportunity in a timely fashion does not arise to a due-process violation.

Levitt's liberty-interest claim fares no better.  Although "reputational damage [] sustained in connection with a termination of employment . . . may give rise to a procedural due process claim for deprivation of liberty . . . actionable under section 1983," Levitt cannot show the elements necessary to make out such a claim.  Cotton v. Jackson, 216 F.3d 1328, 1330 (11th Cir. 2000).  He must show that "(1) a false statement (2) of a stigmatizing nature (3) attending a governmental employee's discharge (4) [was] made public (5) by the governmental employer (6) without a meaningful opportunity for an employee name clearing hearing."  Warren v. Crawford, 927 F.2d 559, 565 (11th Cir. 1991) (quoting Buxton v. City of Plant City, 871 F.2d 1037, 1042-43 (11th Cir. 1989)).

Again, because Levitt had the opportunity to grieve his end-of-year evaluation that resulted in the non-renewal of his contract, and he did grieve the Letter of Reprimand, he cannot make out a due-process claim. "[O]nly when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation . . . arise." McKinney v. Pate, 20 F.3d 1550, 1557 (11th Cir. 1994) (en banc). That Levitt disagrees with the outcome of his grievances does not mean he suffered any due-process deprivation. Levitt could have, but did not, appeal the outcome of his grievances. (3d Am. Compl. Ex. 1 ¶ 4.04 (describing grievance procedures, including procedures "[i]f the grievant is not satisfied with the disposition of the grievance").) Levitt was provided a process to address his complaints, and thus he did not suffer any due-process violation.

Moreover, as Defendants point out, even if he could make out the elements of a due-process liberty-interest claim, he cannot show any damages as to that claim. He admitted in his deposition that he chose not to apply for any teaching positions for reasons unrelated to the events at Success Academy, and that in fact Defendant Lee County School District hired him for a teaching position for the 2017-2018 school year. (Defs.' Supp. Mem. Ex. 4 (Docket No. 68-4) at 204-07; 215-16.) Thus, either the allegedly false statements were not stigmatizing or he suffered no damages as a result of them. His due-process claims fail.

## C. Breach of Contract

Levitt's breach of contract claim contends that the CBA and state law required the District to renew his contract. He contends that, in the absence of retaliation for the exercise of his First Amendment rights, he would have been entitled to a better end-of-year

16

rating. (3d Am. Compl. ¶ 77.) With a better rating, the CBA required renewal of his contract: teachers with three consecutive years of "effective" ratings or above and no disciplinary actions are entitled to reinstatement. (3d Am. Compl. Ex. 1 ¶ 5.01(1)); see also Fla. Stat. § 1012.33(3)(b).

But the time between the November 2, 2016, email and the end-of-year evaluation is too great for a determination that the email caused the alleged retaliation. Rather, Levitt argues repeatedly that the alleged retaliation happened because of the February email copying District administrators. Levitt cannot establish that he was entitled to a better rating, and thus that the District breached the CBA or violated Florida law by failing to reinstate him. His contract claim fails.

**D.      Defamation**

Levitt claims that Iovine defamed him by telling Assistant Principal Harris that Levitt was not a team player and that he should not socialize with Levitt (3d Am. Compl. ¶ 83), and told a Success Academy guidance counselor that Levitt would not be renewed because he was not pulling his weight and was not cooperative. (Id. ¶ 84.)

Levitt cannot base his defamation claim on any oral statements, because he has failed to establish that those statements were, in fact, made. Harris's testimony regarding Iovine's statements do not support either of the allegations Levitt makes. (Harris Dep. at 10; 81-83.) And Iovine denies making the statement. (Iovine Dep. (Pl.'s Supp. Mem. Ex. 7 (Docket No. 67-8) at 57-58.) Levitt did not depose the guidance counselor to whom Iovine allegedly made the statements, and again, Iovine denied making any statement that Levitt's contract would not be renewed. (Id. at 215.) She was not asked whether she told

the guidance counselor that Levitt was uncooperative. Finally, any alleged statement that Levitt's class sizes were smaller than other teachers is simply not defamatory.

At this stage, Levitt cannot rely on his own testimony to support his defamation claims. And that is all he has. Defendants are entitled to summary judgment on his defamation claim.

**CONCLUSION**

Plaintiff has not come forward with facts in the record to establish any genuine issue as to his claims. Accordingly, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Partial Summary Judgment (Docket No. 67) is **DENIED**; and

2. Defendants' Motion for Summary Judgment (Docket No. 68) is **GRANTED**.

**The Clerk shall enter judgment accordingly, terminate all remaining deadlines as moot, and close the file.**

Dated: November 26, 2019

*s/ Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge